[No. 5075.]

## WILLIAM VAN *v*. THE STATE.

MURDER—CHARGE OF THE COURT—CASE APPROVED.—The trial court, in Miles's case, 18 Texas Court of Appeals, 156, instructed the jury that "every rash and inconsiderate killing under some sudden impulse, wherein there is no sedate mind and formed design to kill, is murder in the second degree; the law implies the malice. Every voluntary killing of a human being is murder in the second degree, unless the circumstances attending it upon the one hand show express malice, which would then be murder of the first degree, or upon the other such as would reduce the offense to manslaughter, or, would excuse or justify the homicide." In that case it was *held* that the "first clause is radically erroneous, because it is not true. The sudden impulse may have resulted from adequate cause, arousing such passion as rendered the homicide act 'rash and inconsiderate;' and then the homicide would not be murder of the second degree, but manslaughter. Nor was the error in the first clause of the instruction efficiently corrected by the second clause, in as much as the latter was not explained to the jury as a qualification, or modification of the former, and may have been understood by the jury to apply to a homicide of a character different from that spoken of in the first clause." See the opinion in this case for its approval of the ruling in Miles's case, *supra*, and note instructions of the trial court, which are *held* to be, in substance, the same, and, therefore, upon the same reasoning, erroneous.

APPEAL from the District Court of San Saba. Tried below before the Hon. A. W. Moursund.

The indictment charged the appellant with the murder of Eugene Houghton, in San Saba county, Texas, on the seventeenth day of March, 1886. His trial resulted in his conviction of murder in the second degree, and his punishment was assessed at a term of twenty years in the penitentiary.

James Flack, a brother-in-law and business partner of the deceased, was the first witness for the State. He testified that he last saw Eugene Houghton, the deceased, alive, in the town of Llano, on the afternoon of March 16, 1886. He was on the eve of starting to San Saba, to defend Ellis Bybee in his pending trial for horse theft. If deceased had a pistol witness did not know it. He had known the deceased intimately for three years, and had never seen him with a pistol. Witness was satisfied in his own mind that the deceased had no arms when he started to San Saba. The deceased left a wife and three children surviving him. His wife was not present upon the trial because of her impending accouchment. About ten o'clock, a. m., on March 18, 1886, witness saw the dead body of Eugene Houghton, in Hart's store, at Cherokee, San Saba county. Witness examined the body, and found that a ball had passed entirely through it, entering about an inch above the left nipple, and passing out of the body immediately under the right shoulder blade. He also observed some bruises and cuts on the face, forehead and head. On the next night the witness saw the buggy used by deceased, at the livery stable in Llano. He found a cartridge and an ordinary sized pistol in the rear end of the box of the buggy. The pistol was delivered to 'Squire Hanna, in the exact condition in which it was found. Three of the chambers were loaded, and three were empty. Witness took the pistol to be a rim-fire weapon, and the cartridges to be center-fire explosives. Witness observed three or four impressions on the rims of the cartridges, indicating, to his mind, that the hammer of the pistol had been snapped on them. Some of the impressions were plainer than others. The cartridge exhibited as the one found in the box of the buggy was similar to those found by the witness in the buggy. The buggy was so constructed that a man sitting on the seat could not possibly reach in to the box and get the pistol from where it was when the witness found it.

Cross-examined, the witness testified that the buggy had a smooth bottom and, doubtless, the pistol could have slided from the front of the buggy bottom to the back, where it was found. The defendant was acting as and represented himself to be the constable of precinct number five, of Llano county, and was, so far as the witness knew, on friendly terms with the deceased. Witness did not know who engaged deceased to defend Bybee.

John D. Walters, county attorney of San Saba county, testified, for the State, that he last saw the deceased alive on Wallace

street, in San Saba: He walked from Williams's saloon to Dof-flemeyer's hotel, where he encountered witness, bade him adieu, and invited witness to call on him when visiting Llano. This was about mid afternoon. He appeared in a good humor, was very polite, but was drinking somewhat. About this time the defendant drove up in a buggy, and asked deceased if he was ready to go. Deceased replied in a jocular manner: "I reckon we had better go, or we might be taken in." Defendant placed his hand on a gun he had in the buggy, and in a jocular manner replied: "I reckon not with this." Deceased then got in to the buggy, and he and deceased drove to Williams's saloon, where they got out of the buggy. They went in to the saloon, and remained from five to ten minutes. When they came out they had three or four round parcels covered with paper, which witness took to be bottles. Witness last saw them passing around a corner. Deceased was drinking considerably, and staggered almost from his feet as he climbed in to the buggy. Defendant was not so much under the influence of liquor as the deceased.

Dave Fentress testified, for the State, that he lived three miles south from the town of San Saba. He knew neither the defendant nor the deceased. He did not know positively that he had ever seen the defendant before this trial. He heard of the killing of Eugene Houghton on the day after it occurred. While engaged repairing a wire fence, near the San Saba and Llano road, on the evening before he heard of the killing, he saw two men traveling in a top buggy, drawn by a black matched team, from the direction of San Saba towards Llano. It was the belief of the witness that the defendant was the man who occupied the east or left hand seat of the buggy. The man who occupied the right hand seat, held the lines, and was driving, while the defendant held a stick or whip in his hand. Ellis Bybee was riding horse back behind the buggy. Witness heard the buggy coming at a distance of two or three hundred yards. When he first saw the buggy the horses were in a lope. The man holding the lines checked them up at a point nearly opposite the witness, when the defendant whipped them up, and they started off at the same gait. The man whom witness believes he identifies in the defendant, said: "I told them I would bring him out, and I have got him out." The other man said nothing that the witness heard, and seemed to be exerting himself to keep the horses in check. That man was taller than the defendant, and wore a black mustache and hair. Ep Houston at that time and now

lived on the San Saba and Llano road, about five miles south of San Saba.

Dave Barton testified, for the State, that, on March 17, 1886, he was the mail carrier on the route between San Saba and Llano towns. Witness knew the deceased, and last saw him alive about four o'clock, p. m., on March 17, 1886, about six and a half miles south of San Saba. Defendant was with the deceased in the buggy, and Ellis Bybee was riding horse back behind. Deceased had the lines, and defendant was whipping. They passed witness in a full trot, and just as they swept past the witness the defendant called to witness: "How d'ye," and struck the horses. Deceased said: "Don't drive so fast." Defendant replied: "I am driving this team."

B. S. Bybee testified, for the State, that he last saw the deceased alive between two and three miles south of the town of San Saba, going towards Llano. The defendant was with him, but witness did not know which of the two was driving the buggy in which they were riding. Ellis Bybee was a short distance in advance of them on horse back. Witness was a short distance behind the buggy in a wagon, traveling in the same direction. G. W. Anderson was behind witness driving in a wagon. Witness's daughter, Elizabeth, was with the witness in his wagon. Deceased was sitting on the right hand side of the buggy, and appeared to be drunk. The defendant was about half drunk. They had as much as two bottles of whisky with them, from one of which they gave the witness a drink. The defendant, two or three times asked witness's daughter, Elizabeth, to get into the buggy and ride with him and deceased. Deceased said nothing, but motioned for her to get in. Witness told them that the tire on one of his wheels was loose, and that Elizabeth had better stay with him to watch it. When witness next saw deceased, he was lying dead in the road near the thirteen mile post. About three weeks afterwards the witness saw the defendant near his, witness's, field. Witness went to see him in response to his request to do so, brought by John Van. Witness, Mr. McCulloch, and Mr. Hickman approached the body of the deceased from different directions, reaching it at about the same time. Witness made no examination of the body, but saw blood on the shirt front. Witness stayed at the body not exceeding five minutes, the sun being then not more than an hour high. Nothing was then seen of the defendant, or of the buggy or horses. Witness had known the defendant, who was his son-

in-law, about twelve years, during which time he had sustained a good reputation as a peaceable, law abiding man. Witness had borrowed one hundred and thirty dollars of G. W. Anderson since the beginning of the present term of court, fifty dollars of which he had paid the lawyers defending Ellis Bybee's case. Defendant and deceased both told the witness that the deceased spent the night of March 16 at defendant's house. Defendant and deceased were good friends so far as witness knew.

Ellis Bybee testified, for the State, that the defendant was his brother-in-law. Houghton, the deceased, and the defendant, were in the town of San Saba on the seventeenth day of March, 1886. The former came to San Saba to defend the witness, who was being prosecuted for horse theft. Witness left San Saba before defendant and deceased did, on the evening of the day mentioned. They overtook him about three miles south of San Saba, stopped, and gave him a drink of whisky. Defendant was then driving. He told witness to go on home. Witness kept up with the buggy. Old man Van's Winchester rifle and the defendant's pistol—the weapon in evidence—were in the buggy. When near the twelve mile post, and not far from Luth. Montgomery's house, the defendant fired the Winchester rifle three or four times, and attempted several times to discharge the pistol. As it snapped and refused to fire, defendant handed it to the deceased, who threw it under the buggy seat, remarking that it was dangerous. This all occurred about a half mile from where the deceased was killed. From the point where defendant discharged the gun, the road was some what down hill. At or near the bottom of the hill the buggy stopped, the defendant sprang out, said that he had been run over long enough, and would kill the deceased if deceased did not release the lines. He then snapped the gun at the deceased, who was sitting in the buggy. Witness then called for defendant not to shoot deceased; that all parties were friends, and proposed a drink of whisky all around. The defendant then turned on witness and told him to get off his horse and pray. Witness got off his horse, and just as his feet struck the ground, defendant fired at him. Witness sprang on his horse and ran. He had got about seventy yards, when another shot was fired, and presently the buggy, empty, passed the witness. Looking back, the witness saw the defendant walking down the road with the gun. The witness was behind a thicket of trees when the last shot was fired, and could not see the parties from that point. Witness followed the buggy down the

road, and, at about half a mile, passed a four horse wagon driven by Perry A. Cook. Witness overtook the horse and buggy at Cherokee creek, about two miles from the place of the killing. The horses had stopped in the creek, and Mr. Houston was trying to get them out of it. Witness did not stop, but went to the Cherokee store. At Van Emberg's black smith shop, near the Cherokee store, witness found Messrs. Van Emberg, Jesse Van, Hickman, McCulloch, and McLean.

The witness told the parties at Van Emberg's blacksmith shop substantially what he has repeated on this stand. If the witness told the parties that he did not know who was killed, or that deceased had a pistol drawn on defendant when he last saw them, he can not remember it. Witness told his sister, the defendant's wife, at her house on that night, substantially what he has testified on this trial. If he said to his sister: "Kate, I am afraid Bill or Eugene, one or other, or may be both, is killed," he could not remember it. He had no recollection of telling John Van that defendant had the gun and deceased the pistol. He had no recollection of telling either John Van or Mrs. Van that the defendant could not help killing the deceased. He had no recollection of telling them that he was "afraid Eugene had gone up." Witness was drinking on the evening of the homicide, but not enough to obscure his mind as to what occurred. No promises with respect to the cases pending against witness had been made him to influence his testimony in this case. Witness told William Bybee about the killing, but had no recollection of telling him that the defendant could have done only what he did do. After the arrest of the defendant, old man Van offered the witness fifty dollars to testify that deceased snapped a pistol at the defendant. No one was present when that offer was made, nor had the witness told any one of it. Witness told his father that William Van had tried to induce him to leave the country. Witness did not go with the defendant to G. W. Anderson's when the latter was arrested. He did not take the defendant's horse back home from Anderson's, nor did he know who did. Witness heard no quarrel between defendant and deceased prior to the shooting. When defendant, standing on the ground, five or six feet from the buggy, was threatening to kill the deceased, the deceased placed his finger on his forehead, and said: "Bill, you could not hit me here." The pistol in evidence belonged to the defendant. After the last shot was fired the horses, drawing the buggy, passed witness in a run. Witness did not see two men in

a wagon traveling that road towards San Saba. He did not remember meeting the stage driver about a half mile south of the place of killing.

F. M. Hickman testified, for the State, that he was at the black smith shop at the Cherokee store on the evening in March, 1886, when Ellis Bybee came by and reported some trouble down the road. Ellis appeared very much excited. Witness's attention was first attracted by the remark of Jesse Van, who said: "Ellis, you are drunk!" to which Ellis replied: "I have been drinking, but am not drunk, and know what I am saying." Ellis then said that they—meaning defendant and deceased—were making threats, and disputing as to who should hold the lines; that he rode back and asked them not to fight, but, like friends as they were, to take a drink; that defendant told him to get down and pray, and that, as he got down, defendant snapped his gun at him. Ellis then s ld: "I am afraid Eugene is gone up." Witness, at the request of old man Van, then went to the place indicated by Ellis, and found the body of the deceased. En route, he saw a man taking a two horse buggy, the horses still attached, from Cherokee creek. Mr. McCulloch was with the witness. They found the body of the deceased near the thirteen mile post. No arms were found about the body. A gun ball had passed entirely through the body from near the left nipple. It went out under the right shoulder blade. The wound was necessarily fatal. There were some bruises and cuts about the face and head, which witness thought resulted from the body being dragged over the stones. A drag showed that the body had been hauled about twenty or twenty-five yards from the north of where it lay. From the impression on the ground, the witness concluded that the legs of the body had been moved west. It looked as though the feet had been placed as they were found after the buggy passed. Witness did not think that the buggy wheels passed over the body. Witness had known defendant's reputation as a peaceable and law abiding citizen to be good. Witness's acquaintance with Ellis Bybee was limited. So far as he knew it, Ellis Bybee's reputation for truth and veracity was not good. Four or five cigars and a handkerchief were the only articles found in the pockets of the deceased. At a point in the road between sixty and a hundred yards from where the body lay, an impression on the ground showed that a heavy body of some kind had fallen there.

James Hampton testified, for the State, that on the seventeenth day of March, 1886, he saw a buggy with a black or brown team, at the San Saba and Llano road crossing of Cherokee creek. The vehicle and team were then in charge of Mr. R. W. Taylor. Witness drove the team and buggy to Cherokee store; thence to the house of justice of the peace Hanna; thence back to Cherokee store, and thence to Llano. The pistol in evidence, in its present condition, lay loose in the back part of the buggy.

R. W. Taylor testified, for the State, that, on the evening of the killing, from a field near the Lano road, he saw a buggy, drawn by a driverless team, going towards Cherokee creek. He caught the team and turned it over to James Hampton. He found a coat in the front part of the buggy and a loose pistol in the back end. Witness saw Ellis Bybee when he passed. Ellis did not stop. The thirteen mile distance post was about two and a half miles distant from Cherokee creek, over some very rough road. The pistol exhibited on this trial was the pistol witness saw lying loose in the buggy. Witness turned everything over to Hampton in the same condition in which he found it. Witness saw Perry Cook and his four mule team at the creek. The buggy reached the creek first, Bybee next, and then Cook and his wagon.

J. T. White testified, for the State, that he saw the body of the deceased before it was moved from where it was found. It was down grade from that point to the Cherokee creek. Witness was shown where a hat was found, some two hundred yards from where the body lay. He saw where the body had been dragged over the ground. A thicket of trees, so dense as to completely obscure the vision, grew about seventy yards from where the hat was said to have been found. Two dim roads left the main Llano and San Saba road between the point where the body was found and Cherokee creek. A plain road turned to the left from the Llano and San Saba road near the fourteen and a half mile post. That road passed the Reeves and the Barber places, and intersected the Llano road again below Thaxton's field, at a distance of about three miles. The body had on a coat, pants and vest. At a point about fifteen or twenty yards above the "drag" an impression on the ground showed the fall of a heavy body. The ground disclosed, also, that the legs of the deceased had been moved. The face, head and forehead of the deceased showed cuts and bruises, evidently made by rock and stone over which it was dragged. The cuts and bruises, however, were such

as might, perhaps, have been inflicted with a gun barrel. A fresh horse track was trailed from where the hat was found to and behind the thicket of trees described. The horse had been running.

James York, testified, for the State, that he saw the deceased's body on the night of the killing. He saw the trees and brush to the left of the road. He pointed out to White, Miller, and Hickman the point where he found the hat. The hat was found by witness about two hundred yards north of where the body lay, and on the west side of the road.

C. Coffman testified, for the State, that he went to San Saba on the morning of March 18, 1886, to summon the officers. The sheriff being absent, deputy sheriff Colin Selph returned with witness to the body. The pistol, as now exhibited, was in the condition it was when exhibited on the inquest.

Justice of the peace Hanna testified, for the State, that the pistol in evidence was in the same condition in which he received it from James Flack. He described the deceased's body as he found it, and expressed the opinion that the cuts and bruises on the face and head were inflicted with a blunt instrument of some kind.

Colin Selph testified, for the State, that several days' diligent search for the defendant, beginning on the day after the homicide, proved fruitless. Defendant was brought to the San Saba county jail on the third day of April, 1886. Witness saw the defendant and the deceased together in the town of San Saba, on the seventeenth day of March, 1886. When witness saw them they were in front of Wiley Williams's saloon. Defendant, after some effort, prevailed upon deceased to get into the buggy for the purpose of starting home. When they got in front of Carter's store, deceased said that he wanted some oysters and crackers. Witness got the oysters and crackers for him from Carter, and defendant drove the buggy around the square, and on his return to the place where he left witness he asked: "Does that go?" He appeared to be drunk, but in a good humor. They then drove rapidly off on the Llano road. Among other places at which witness hunted for the defendant was the place of William Bybee, which he reached at night. As he approached the house he thought he saw the shadow of a man as he started from the house in flight. Bybee and his son, however, told witness that they had not seen defendant.

William Bybee testified, for the State, that B. S. Bybee was

his brother, and Ellis Bybee was his nephew. Witness remembered the night visit of Selph and Robbins to his house, in search of the defendant. About twenty minutes before their arrival, witness saw the defendant in his, witness's field, which was in Llano county, about three miles from Babyhead. Ellis Bybee was at the witness's house two or three days after the killing, and gave the witness an account of the tragedy. Witness went to the town of Llano with Ellis Bybee and his father to see the lawyers about the horse theft case pending against Ellis. Witness heard the lawyers say that Ellis was in no danger of conviction, but he heard them make no promises of any kind to Ellis or his father. Ellis Bybee's reputation for truth 'and veracity was bad. Defendant's reputation as a peaceable, law abiding man, was good.

G. W. Anderson testified, for the State, that he arrested the defendant. Defendant came to the witness's house at night, and the witness covered him with his gun, and arrested him, requiring his son to tie him. Witness had that day read the proclamation of the Governor, offering a reward for the arrest of the defendant. Witness delivered the defendant to the jailer of San Saba county, and collected the reward through Mr. Harris. Ellis Bybee was at the witness's house on the night of the arrest. Witness did not know whether or not defendant brought a horse to the house with him, nor whether any such horse was taken back by Ellis Bybee. Witness had no arrangement with defendant, his father, or any body else, looking to defendant's surrender to him. Witness gave one hundred and thirty dollars of the reward money to B. S. Bybee for the defendant's wife and children. Witness did not offer to release the defendant just before getting to the San Saba jail.

James Flack, recalled for the State, testified that he examined the inside of the buggy top, and found an indentation on the hindmost of the iron bows, which he thought was made by a leaden bullet.

Richard Halden testified, for the State, that the pistol and cartridges exhibited to him are, respectively, a center-fire pistol and center-fire cartridges. The impressions on the heads of the cartridges were caused by the pistol being out of repair. The hammer is not in place, and will not strike the cartridge center, as it ought to. It might be possible to discharge the pistol in its present condition. The State closed.

Elizabeth Robbins was the first witness for the defendant.

She testified that she saw the defendant and the deceased to-
gether in a buggy, on the San Saba and Llano road, on the even-
ing of March 17, 1886. Defendant several times asked her to get
in to the buggy with them. He told her that she would not re-
gret her ride with them if she would take it, and that they would
reach Cherokee before sun down. They had whisky with them.
Witness's brother, Ellis Bybee, was on horseback, a short dis-
tance ahead of them. When defendant invited witness to take
a seat in the buggy, the deceased said something, made a
motion with his hand, and made room for witness. Witness did
not know what defendant meant by saying that witness would
not regret riding in the buggy. Witness was at G. W. Ander-
son's house when Anderson brought the defendant in to the house
under arrest. Ellis Bybee was there also. Witness heard no
conversation between the parties. She, however, heard Ander-
son say that he would take defendant to San Saba on the mor-
row. Witness was not up next morning when Anderson
started to town with defendant.

John Forehand testified, for the defense, that the reputation of
Ellis Bybee for truth and veracity was bad. The witness heard
his reputation in this respect discussed in connection with a case
of horse theft pending against the said Ellis Bybee and one
Tubbs. It was said that Ellis was going to turn State's evidence
in this case. Defendant sustained a good reputation as a quiet
and peaceable man.

Mrs. Van, the wife of the defendant, testified, in his behalf,
that the deceased stayed at her house on the night of March 16,
1886. He left in his buggy on the morning of the seventeenth, for
the town of San Saba, the defendant going with him. Deceased
was on his way to defend Ellis Bybee for horse theft, and sug-
gested that the gun and pistol be taken along, remarking that
he did not know what might happen on the trial, and the weap-
ons might be needed. Defendant protested against taking the
weapons, with the remark: "We both know our failing, and I
think it best not to take them." Deceased insisted, and defend-
ant got the weapons. The pistol had but three loads. Late in
the evening witness's brother, Ellis Bybee, came to the house
and told witness that he was afraid one of the parties was killed;
that deceased had snapped the pistol; that defendant had the
gun and told deceased not to shoot; that defendant then jumped
from the buggy, the gun was discharged, and he, Ellis, ran off,
and saw no more. Witness gave Ellis some clothes and provis-

ions to take to the defendant. One night, some time after the killing, the defendant came to the witness's house. On the next night he went to B. S. Bybee's house, and thence to G. W. Anderson's house, Ellis Bybee going with him. Ellis brought his, defendant's, horse home. Ellis, when he came to witness's house on the evening of the killing, told witness that his reason for thinking that deceased was killed was that when he left the parties, defendant was on the ground and the deceased was in the buggy, and the buggy was empty when it passed him a few minutes later. Ellis suggested to witness to go and see who was killed. Witness replied that others could go. She was uncertain as to which of the two, if either, was killed, and was somewhat excited. Witness knew only by hearsay that defendant went to B. S. Bybee's or G. W. Anderson's on the night of his arrest, or that Ellis went with him.

John Van, defendant's brother, testified, in his behalf, that deceased came to defendant's house on the night of March 16, 1886, en route to San Saba to defend Ellis Bybee for horse theft. He and defendant left for San Saba on the next morning. Deceased before going suggested that arms should be taken, as they might be needed. Defendant objected, but deceased persisted and prevailed. Defendant got the gun and deceased the pistol. Mrs. Van gave the deceased the only three cartridges she had in the house. Witness met Ellis Bybee in Cherokee on the evening of the same day, and asked him: "What does this mean?" Ellis replied that the defendant and the deceased quarreled all along the road home; that deceased caught up the pistol, when defendant sprang out of the buggy, discharging his gun by accident, the ball striking the ground; that he, Ellis, then ran off, hid behind some bushes and saw no more of the parties, but presently heard the report of the gun, and saw the horses, in flight, pass down the road towards Cherokee with the empty buggy. No one was present when Ellis made the statements testified to by witness. On the night before the killing, at defendant's house, witness heard the deceased ask the defendant if he had any weapons. Defendant replied that he had a pistol and that the old man had a gun. Deceased replied that he proposed to talk plainly on the trial of Ellis Bybee's case, and that the arms might be needed and had better be taken along.

Jesse Van testified, for the defendant, that he last saw the deceased when he got in to the buggy on the morning of the day of his death, to go to San Saba. Immediately before starting,

defendant came to witness and said that deceased said that he proposed to talk plainly on the trial of Ellis Bybee's case, and wanted some arms to take to town. Witness told defendant that he could take his gun. Late that evening Ellis rode up to the witness at Cherokee and, in the presence of several parties, including McLain and Van Emburg, said to witness: "Mr. Van, Billy (defendant), or Mr. Houghton, or both, I am afraid, are either killed or badly hurt. They have been drinking and quarreling all the way. Mr. Houghton had a pistol in his hand, and said: 'Bill, G—d d—n you, I will kill you.' Bill jumped out of the buggy, his gun was discharged by accident, sending the ball, he thought, under the bellies of the horses; that he, Ellis, then ran and hid behind a clump of trees;" that he presently heard another shot, and soon saw the horses pass with the buggy empty; that he then came on to Cherokee, passing the buggy and horses at the creek. Witness thought that Ellis was drunk and told him so. He replied that he had been drinking, but was not drunk. Witness got Hickman to go up the road and ascertain what, if anything, had happened. Witness did not see the defendant for several days. He stayed at witness's house one night after the killing. Witness knew that Anderson took the defendant to the San Saba jail. He talked to Anderson when he, Anderson, was on his way to town to collect the reward money. Witness did not see the dead body of Houghton while it was in the Cherokee store. Witness was on the store gallery at that time, but was under arrest, and the store door was closed. Witness did not know why he was arrested. Witness denied that he ever offered Ellis Bybee fifty dollars to swear that deceased snapped a pistol at the defendant. Witness, however, was not addicted to "going back" on his words or actions, and was perfectly willing to divulge all of his negotiations with Ellis Bybee in connection with this case. Ellis Bybee told witness that he felt very uneasy and wanted to leave the country. Witness then told the defendant's wife that he would give Ellis twenty dollars to leave on. Witness gave the twenty dollars either to Ellis or to the defendant's wife for him; he did not remember which. Ellis did not leave, and sent the money back to the witness.

J. H. McLain testified, for the defense, that he was at Van Emburg's shop at Cherokee when Ellis Bybee arrived and reported the trouble between defendant and deceased. Speaking to Mr. Jesse Van, Ellis said: "Mr. Van, I am afraid that either

Billy or Houghton, or both are killed. They fussed and quar-reled all the way from town. They stopped on the slope between the creek and Montgomery's, and Houghton said: 'Bill, if you don't give me those lines I will kill you.' Bill jumped out of the buggy with the gun and said, 'No you won't.' I rode back and told them not to quarrel; that we were all good friends. Billy told me to get down and pray for him. I got down and he shot under my horse's belly. I jumped on my horse and ran about seventy-five or a hundred yards, to a point behind a clump of bushes, and heard another shot. I then ran into the road and the buggy came by with no one in it. I saw Billy walking on down the road behind the buggy. I ran on and passed the buggy in the creek." Defendant's reputation for peace and quietude was good.

Van Emburg testified, for the defense, that he was present in the crowd when Ellis Bybee reported the trouble down the road. Ellis was very much excited, and gave three or four accounts of the transaction, no two alike. He said that he did not know which of the parties was hurt—defendant or Houghton—and then that he was " afraid Eugene is gone up."

Ben Teague testified, for the defense, that, while he was stand-ing nearly Wiley Williams's saloon, in San Saba county, on March 17, 1886, he saw the defendant and Houghton drive to that saloon from the hotel. Houghton got out of the buggy and went into the saloon. He appeared to be pretty drunk. De-fendant was not so drunk. He, defendant, asked witness to hold his horses while he went into the saloon to induce Hough-ton to go home. He said that he brought Houghton to San Saba, and had to see that he got back. Witness held the horses, and presently the defendant brought Houghton out, with two bottles of whisky, and got him in the buggy. They then drove to Car-ten's store, around the square and back to Carten's store, and then out of town. Defendant was then driving.

J. J. Kuykendall testified, for the defense, that he saw defend-ant, deceased, and B. Montgomery together at Williams's saloon, in San Saba, on March 17, 1886. He loaned deceased three dol-lars while at the saloon. Defendant and others were trying to get Houghton to go back to Llano. Witness was on defendant's official bond as constable, and gave him up because he became dissatisfied with defendant.

W. B. Smith testified, for the defense, that Ellis Bybee's repu-tation for truth and veracity was bad. He had never heard his

reputation discussed prior to the institution of this prosecution.

James Beck testified, for the defense, that he had heard Ellis Bybee's character for truth and veracity denounced by Forehand, William Bybee, and others. Witness and defendant had a slight misunderstanding at Lampasas in January, 1886. Both parties were drinking. Defendant covered witness with his pistol, which witness pushed aside. They made friends and went home together. Witness did not know whether or not defendant really intended to shoot him on that occasion. The defense closed.

James Anderson testified, for the State, that he was a son of G. W. Anderson. Witness was at his father's horse lot on the night of defendant's arrest. Some one whistled, and witness answered. Witness did not know the party whistling at the time. He invited the man into the house. Defendant appeared and went into the house with the witness. He shook hands with Elizabeth Robbins, who was then present. Witness's father then got his shot gun and arrested the defendant. Ellis Bybee was at Anderson's house on that night. If defendant had a horse, witness did not see it. If Ellis took off any horse on the next morning except the one he rode, the witness did not know it.

The motion for new trial raised, among others, the questions discussed in the opinion.

*Burleson & Harris*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

HURT, JUDGE. The indictment was for murder of the first degree, and the conviction for murder of the second degree.

The court in its charge to the jury used the following language: "Any rash and inconsiderate killing from some sudden impulse, without any sedate and deliberate mind, is upon implied malice, and is murder in the second degree." In the paragraph preceding this the jury were told that "implied malice is what the law implies from the mere act of a voluntary killing where the circumstances and facts upon one hand show no deliberate purpose to kill with a sedate and deliberate mind and formed design, nor, upon the other, are such as would reduce the offense to manslaughter or negligent homicide, or which excuse or justify the homicide." The two quotations here made are the only instructions upon implied malice, or upon murder of the second degree.

These two paragraphs, taken together, are essentially the same as the instructions given in the case of Miles v. The State, 18 Texas Court of Appeals, 156, and which were held by this court to be radically incorrect in that part which is analogous to the paragraph we have first quoted. It was further held in that case that the remaining instruction, though correct, did not cure the error, and that the two, taken together, were calculated to mislead and confuse. We think the reasoning applied in that case applicable to the one we are now considering, and that decision conclusive of this appeal. (See also Neyland v. The State, 13 Texas Ct. App., 536.)

The conclusion reached obviates the necessity for passing upon the assignments of error calling in question the correctness of the rulings of the court in refusing a continuance, and in forming the jury. The judgment is reversed and the cause remanded.

*Reversed and remanded.*